I would like Judge Lurie to preside so that I can make a motion. And my motion, Presiding Judge, is to move the admission of my law clerk, Charlene Lee. Please stand, Charlene. Charlene is a member in good standing at the Bar of California. Is that still in the United States? We give that back to Mexico, yes. And I think you each work with Charlene and know her to be one of our finest and someone who has contributed greatly to the work of our court, and I move her admission with great enthusiasm. I wonder if there's a red brief. Hearing none, Judge Raynard, should we grant this motion? Judge Raynard? Yes. We grant the motion. Please raise your right hand. Do you swear or affirm that you will report yourself as an attorney and consular of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations, and welcome to the Bar of California State Court of Appeals. The bill is served. Congratulations. Now our first case this morning is Cummins-Allison v. SBA. Are you going to divide an argument? We are, Your Honor. Never a very good idea, but you can give it a try. Well, notwithstanding the court's warning, if it's all right, we will. My plan here this morning, please the court, is to address issues related to a stop on the 806 patent and to pass the baton to my colleague representing SBM to discuss the 503 patent and issues related to damages. So with the court's permission, I'll go ahead and jump into the question of reexamination, a stop which was raised initially in some motions that Cummins had filed, two motions, I believe, and then was subsequently discussed in their briefs. As the court knows, there was a reexamination taken on the 806 patent. The question is whether that reexamination should have stopped my client, AMRO, and SBM as well from pursuing the art that we claim is invalidating here. But aside from that, you had a jury grade against you, right? We did. Isn't that entitled to substantial deference? It is, but it was erroneous, as the court's case is. Then don't you want to address that? I certainly do, and I can jump right into that. There were two groups of prior art that were asserted against the 806 patent. There was the Toshiba-Mosler references and the Jones and O'Malley references. These were two different groups. The Toshiba-Mosler references, and let me just start with those, were from 1985 and 1989 respectively. The stipulated priority date for the 806 patent was May 19, 1992. I looked at both Toshiba and Mosler with some interest. Do those enable anything? Yes, it's our position they do. In fact, the PTO agreed with that. Was there a list of specs? The Mosler reference was a parts listing. That's true. The Toshiba reference was a specification for how the product worked and how the product functioned. So, yes, from our point of view it did, and I would note that during the reexamination, these two pieces were considered. And they found it valid. They did, but they found it valid over Cummins' objections that the two pieces were not publications. How about Jones and O'Malley? They don't have that written. They don't, and Jones and O'Malley clearly invalidate this patent as well. The really only novelty in this patent, in the 806, was the speed increase. It's really undisputed, I think, that the prior art had denominating devices that could count bills at 600 bills per minute. That's in the record. Toshiba and Mosler established that, and that's essentially undisputed. So the question really was only whether it was inventive to go from the 600 bills per minute that's discussed in Toshiba and Mosler. Wasn't there also additional evidence introduced that, in addition to the speed factor, that significant or, let's say, some additional work had to be done to the machines in order to get to that speed? So it wasn't just a question of speed or a new microprocessor. Absolutely. There was evidence at trial that Cummins put on that suggested that they did a lot of engineering on the transport path in particular. What it came down to was Cummins' use of O-rings to hold the dollar bills or the bills in place in front of the scan head. But what's critical about that is none of that engineering was novel, and none of it is claimed in the 806 patent, particularly not in the claims that are asserted. So to the extent that the question is... Now you're arguing, I think I heard you argue, that this is an advance over the 600 per minute. Which reference was the 600 per minute in? Mosler and Toshiba. Those are the ones that aren't prior art, right? Because they're not publicly accessible. Well, I think that they are prior art. Cummins' contention is that they're not prior art. Well, you have one of two problems. Either they're not prior art, which you have to get around, or you have to get around the problem that you never used Mosler in connection with O'Malley and the other two references, did you? We did not combine O'Malley with Toshiba and Mosler, but I would argue that we wouldn't need to. But then you can't argue to me that the 600 reference is the only advance in the art, because the 600 reference isn't before us. Or it's not part of the combination, the O'Malley combination. The 600 was not part of O'Malley, that's true. Or the other. In other words, you can't combine Toshiba and Mosler with the other two references. You didn't do that below. We didn't do that below. There was evidence in the record, the Jones patent, as you'll recall, was combined with O'Malley. Now Jones had transport speeds of 1250, 1,250 bills per minute. And so even if one were to take the position that Toshiba and Mosler couldn't be relied on, which I think is incorrect, nevertheless, both Jones, the combination of Jones and O'Malley, clearly taught high-speed denominating. That's what those two patents combined taught. To return to the question of whether Toshiba and Mosler are properly before the court as prior art, there really is no question that these documents are publicly available. At the trial, we put on Mr. Zambito, and that testimony can be found throughout our brief. And Mr. Zambito worked for 35 years in the business of selling currency denominators and testified that he had used Mosler and Toshiba. Did the jury make this finding that you're arguing to us now? The jury was never asked to make a finding on whether or not Mosler and Toshiba were printed publications. There was no question submitted to the jury on that point. There was a finding by the jury that the patent wasn't invalid, but there was no finding on this separate issue of whether it was a printed publication for purposes of prior art. So what we know is the jury either found it wasn't a printed publication or that it was not sufficient to render them obvious. That's right. And so I don't think that you can conclude based on the jury verdict that these aren't properly before the court. They are. They're certainly prior art from our point of view. We believe that to the extent the jury verdict hinged on whether these were printed publications, that they are, because clearly they were. The testimony was essentially undisputed that Mr. Zambito had used these documents in his work. There's your time. There's my time. Thank you. Mr. O'Brien. May it please the Court. My name is Kevin O'Brien. I'm representing SBM. I'd like to address the 503 patent and the damages it awards. The 503 patent, Claim 15, is the only claim at issue. It's a means plus function claim. It's a currency authenticator. It addresses taking output signals from the sensors and comparing it to reference values which are set according to the denomination of the currency. The lower court properly construed the means for comparing limitation. That's the limitation at issue in this case. As a microprocessor executing an algorithm set forth on columns 12 and 13 or 18 and 19 of the 503 patent, the microprocessor has to use one of those algorithms and has to use it for a plurality of what's called type of characteristic information. In this case, magnetic sensitivity or ultraviolet sensitivity. The SBM product does not use any of the algorithms in the 503 patent. The SBM witness testified that the magnetic sensitivity is constant across currency denominations. Plaintiff's expert did not dispute that. Plaintiff's expert simply misapplied the court's construction when he rendered his opinion of infringement. With respect to the ultraviolet sensitivity, the court held that the algorithm continues on column 19 through line 61 and 67. That requires a subtraction step whereby when the value is obtained from the currency, you need to subtract out what's called a no-bill reflectance value and then make the comparison with the designated reference value. Plaintiff does not dispute that we do not use a no-bill reflectance value. Rather, plaintiff contends that this is a pre-processing step, something akin to a normalization. Well, that may be true, but that doesn't get to the issue. The issue is whether or not the defendant is using the algorithm set forth on column 19 for the ultraviolet test, and it plainly isn't. Of course, the district court found in JMOL that Cummins presented sufficient evidence from which a reasonable jury could have found by a preponderance of the evidence that defendants infringe. So obviously, the jury didn't agree, and the judge found that they considered the arguments and found against you. Yes, Your Honor, two points on that. One is, Dr. Stevenson was very clear when he described his infringement opinion and he misstated the algorithm or the construction by the lower court. He simply compared the output from the UV sensor to a reference value, and he said that was enough to show infringement. That's what the jury understood, but that's not what the court said. That's not the court's construction of the means for comparing limitations. The second point I'd like to make is Dr. Stevenson said that there are many differences between SBM's product and the 503 patent. He said these are implementation details. Now, he claims they are meaningless, but this is a conclusory statement. He never does explain what algorithm SBM uses, what algorithm he is referring to in the 503 patent, and why the differences are meaningless, according to him. They are simply not meaningless. The lack of discrimination between denominations of currency is not a meaningless distinction. It's really quite an important distinction. It's mentioned in the summary of invention and in the abstract of the 503 patent. What about damages? Damages? Two points on damages, Your Honor. There was an inclusion of service contracts. The plaintiff's expert testified that service contracts, at least some of them, are entered into years after the product is sold. The product has a lifetime of six years, it gets dirty, service contracts are awarded. Those are included in the lost profits award. Now, that is not the kind of single functional unit that the White House... If they had made the sale, would they have performed that service, whether it's six years later or not? Well, Your Honor, it's possible they would or wouldn't. Frankly, it depends on the condition. The jury seemed to find that they would. The jury certainly included those service contracts, but they never addressed that issue specifically. This is a situation... We have to assume that they made the findings that uphold their judgment, right? We do, Your Honor. This is a question of... So they made a finding that they would have performed those service contracts if they had made the sale, and the jury found that they would have made the sale. So how do we attack that? Well, you are displaced years in time, and this is inconsistent with the right height holding, claiming not all damages are compensable. It has to be foreseeable. It has to be reasonably objective. Are the service contracts functionally related to the patented subject matters? There's no evidence of that, sir, Your Honor. The machines get dirty. They're in a dirty environment. It has as much to do with the patented component as it has to where it sits in the room. Wasn't there evidence that Cummins sells service contracts with a very high percentage of its machines? Yes, Your Honor, and that's why it has to be redone. The damage award has to be redone. There was no analysis, as the court would require, under Lucent or RescueNet or Unilat, of a rigorous economic analysis. It was simply not done. Indeed, plaintiffs withheld survey data and lost sales data, which showed that sales would have been made to third parties in the market for reasons not going to the patented component. They withheld it. Isn't it your obligation to put forward that evidence and to draw it to the attention of the jury? You can't blame them for not bringing forth evidence that wouldn't favor their case. No, Your Honor, but you can comment that the plaintiff's expert did no survey. He didn't even have access to this information. Is our case law that you have to have a survey? You have to do a rigorous market analysis. You certainly do. That is correct. Did you file a J-Mall with respect to damages? It was mentioned, Your Honor, and it was in the court's decision. Did you file one? Was one filed? It wasn't specifically on that issue, no. So shouldn't we deem these arguments to have been waived because of that? No, Your Honor. It was put forward before the court, admittedly in brief fashion, but the court understood our argument and denied it. The court understood it well enough to issue a ruling denying it. So are you familiar with our I-4-I case versus Microsoft Corporation with this respect? And how would that apply to this issue? It's a question of, in view of what has gone on before, did the court understand the issue we were raising and did the other side understand the issue we were raising? And if the court denied it, expressly denied it, it is, I think, reasonable to say that the court understood it. Mr. O'Brien, your time has expired. We'll give you back two minutes of rebuttal time. Would you give Mr. Foote an additional two if he needs to use it? Thank you, Your Honor. So that'll be... Mr. Foote, it's been a few years since you appeared before a rather green trial judge. Well, I've matured a lot. I was a little fresh in those days. Now I'm bordering on a senior citizen, I would suppose. I'll be 84 next year. I have two points I'd like to make just to set the disagreements between those folks and us. Number one, the jury was instructed as follows. First, you've got to first determine that these two documents, 68 and 69, are printed publications before you get to obviousness. Second, you've also got to find that the prior art contains all the elements of the claim before you get to debating obviousness. We now have a general verdict on invalidity. They did not submit any special interrogatories, which they could have done, to find out, but they have a general verdict, and it's my understanding that the better view of the law is that once an issue is submitted to the jury, the verdict can be affirmed on any issue so submitted. Now, therefore, with respect to printed publications, they did not brief printed publications. They never put it in their original brief. Further, the reexamination went all through this because they insisted that the patent office review everything that we were trying, and the patent office found that these documents were not printed publications. That's number one. Number two, let's go to the question of whether or not this prior art contains all of the elements. This claim is far more than speed. In October of 1991, for the first time in the history  tellers could take a deposit, whether it's from a small business or a local individual, take that deposit, run it through a complete denominating machine for every United States currency, eight of them, get a total, goes to a single output pocket, and get a total. That saved enormous time and energy, and it revolutionized teller banking and instigated branch banking, where you could have a little device out there and you wouldn't have to go through the main office. In any event, it's far more than just speed. Sure, we did it fast. It took us four years and $17 million to get it fast. When we started out, it didn't work that fast. Okay, now what about this prior art? As I recall it, the verdict was for us. We didn't get summary judgment. We never asked for it. There is some conflicts in the evidence, but I don't see how that helps appellant. Here we are where you have all of the inferences favor Cummins when we're debating a JMOL on appeal. They want to reverse the trial judge who sent this case to the jury on the theory that there wasn't enough evidence there. Well, there's substantial evidence. Let's look at, we have two experts. One was the chief engineer of our competitor, Brandt. The other one was a long-time expert in this field named Aaron Bausch. They testified that this Toshiba manual did nothing but tell you how to punch buttons and get various results. You can't tell whether there's optical scanning by reflected light or by some other system. It doesn't have a transport system. The denominating system does not denominate all United States currency in one scan and send it to an output pocket for tabulating. That's a key element. They don't do it. Let's assume there's some conflict in the evidence on that. All we have to do, as I understand it under the law, as the trial judge did on the post-trial motions, what he basically said is there's substantial evidence to support the verdict. There may be other evidence, but there's substantial evidence to support this verdict. What I'm getting at is there is substantial evidence that the prior art did not contain all of the elements of the claim. The speed element was very limited. You can't tell from that document, Dependence Exhibit 69, whether or not you go 600 at the slow process or a much more complicated process. Mr. Ford, I'd like to ask you about your cross-appeal. You're asserting that Claim 55 of the 354 patent is entitled priority from the 259 patent. Claim 55 has specific dimensions, 5 times this and 2 times that. Can you point out for me where that is shown in the 259 specification? Yes. The 259 specifications contain 38 exhibits, the same exhibits that's in 354. One of those exhibits shows a side view of the device and it basically says the distance, there's a dimension on it, the distance between wheel 1 and wheel 2 is 2.5, meaning it is the short dimension of United States currency. United States currency is all the same size, 2.5 by 6, whatever, it's all the same size. So when you find a specification that says this is 2.5, multiply that by 5 and you've got the depth of the machine, which is a little close to 13 inches. You take that and put it along the front of the machine, this dimension that's disclosed in the specification. Where is the 259, the 2.5 from the 259 patent? May I approach? Actually, we don't approach here. Why don't you just read the column? Well, it's a document. You mean it's a drawing? No, it's a figure of the... Which figure? That looks like a drawing. Which figure? Well, it's on page 15 of our brief and it has the dimension as item D between the two wheels. It's 2.5 inches. All right, but the claim, the claim recites 5 times and 2 times. I still don't see that in the patent. Well, 5 times 2.5 is the depth. That's the depth dimension. And 2 times the length of the bill is 12 point. And if you take the 2.5 inches... Wait a minute, please. It's on page 15. Here we go. Page 15 of the red brief. All right, we'll move on. I beg your pardon. My mistake. It's in our reply brief, page 15. I'm still not seeing the support for claim 55 in the specification, but move on. Yes, I got the same one. You're going through a lot of arithmetic there, which is not the same thing as a clear statement in the specification. Well, with one of the skill in the art, make these calculations. On page 14 of the reply brief, the following is said. It looks at these axes, 223 and 241 in figure 19, is just short of the length of the narrow dimension of currency. That's 2.5 inches. It specifically describes the distance between those two wheels as 2.5 inches. That's what the specifications say. It is perfectly obvious, then, that if you multiply 2.5 times 5, you get the depth of the dimension.  Beg your pardon? That is correct. But if one of the skill in the art understands that you must multiply 2.5 times 5, then it becomes disclosed to one of the skill in the art, which is what you have to do. I use a little poetry in a sense that I think it's obvious, and I'm arguing that it's obvious, but the fact of the matter is anyone skilled in the art would know the depth of this machine by reference to these statistics. And the width of the machine, this machine is square, as you can tell by looking at the documents. The so-called width of the machine is 2 times the length of the bill, which is 12 inches. You can go through the mathematics, if you want, of how 2.5 relates to 6 inches, and we'll apply it and get the width dimension in various ways. But the simplest way is to simply say this is a square device. What did the jury find on this? What did the jury find on this question? The jury found four commons. Meaning that the jury found there was priority. They were glad to find there was priority. What is this, a question of fact or law? Let me help you out, it's fact. Therefore, the jury was deserving of deference. Did the trial judge err in perceiving this perhaps as a question of law when it is clearly support is always a question of fact? When the judge grants a JMOL on the question of written description, it's certainly a question of law based upon an examination of the facts. I think the legal question is whether or not, based on those facts, could a reasonable jury actually reach a conclusion? Actually, we say written description is not a question of law, it's a question of fact. We say that in all of our jurisprudence. So you don't even have to go to the underlying fact. It's fact, fact, fact. The jury had before it not only these specifications, but both sides put in evidence the file history of 354. By the way, what did the PTO do on re-exam as to priority? They also found for you. I believe the original PTO, the original patent office decision, allowed the claim, therefore it was enabling and had a written description. I believe in the re-examination. Pardon me. The re-examination affirmed the priority date over the objection of the appellants in this case. Sorry to have interrupted you, Mr. Ford. Do I have a little more time? You do. Thank you. I'd like to return to the problem that appellants have in this appeal based upon the fact that the jury was first to find that these were printed publications and second that they were to find that the prior art contained the elements of the claim. The testimony is, and whether it's disputed or not isn't the issue, the testimony that we offered through our two experts was that the Toshiba manual was nothing but a how-to-do, meaning push this button and that. It described nothing. It taught nothing. Nobody in this case ever went to that document and said what does it teach? It's just sitting there with a lot of things in it, but nobody for the defendant ever testified about what it means. Second, our witnesses said it doesn't contain the elements of the claim. Now let's go to O'Malley and Jones, the other combination. O'Malley was a patent that was issued prior to our priority date. O'Malley did not have any speed claimed, none in his patent. The testimony of experts de Blasio and Ehrenbaus on O'Malley was that O'Malley essentially took one item at a time. They had seven pockets. O'Malley never denominated all the currency and sent it to one single output pocket to get a tabulation. And again, Emory, the expert for the defendants, stated a different opinion, but that's not the question. The question is that the evidence supporting the jury verdict is far more than a scintilla. It's substantial. As this case sets, there has been no brief filed, that is the original brief, by the defendants asking that the court change the decision about printed publications, that it's against the weight of the evidence. There was no brief filed on that issue when this appeal was filed here. Now, I'm not fond of saying anything about waiver, but it seems to me that the court may want to consider whether or not if they don't put it in their original brief, they can argue the matter in a reply. But in any event, the second thing I'd like to say is the same applies with respect to the issue of whether or not the various pieces of prior art contain all the elements of the claim, which they do not. And there has been no appeal from that. The fact of the matter is that a general jury verdict should be supported by any issue submitted to the jury. I thank you very much. Thank you, Mr. Foote. Mr. O'Brien. Thank you, Your Honor. With respect to the forced appeal, I would refer the court to column 4, line 16 of the 354 patent, as well as to the file wrapper, which says that the objective of the invention is to detect currencies from multiple countries. In the file wrapper, Germany, Canada, and the U.S. are given as examples, all of which have different sizes with respect to the length and the width. The judge, in his order, focused on the testimony of a litany of plaintiff's witnesses, Graves, Jones, the expert, etc., discussing the novelty of miniaturizing the product. So it was hardly obvious to shrink the product to a certain size. And by saying that some dimension is 2.5, the width of one currency doesn't tell one of skill and the art much, if anything, because you don't know what currency you're dealing with. The PTO found that one of skill and the art would know that 2.61 and 6.14 are the dimensions of U.S. currency multiplied by 5 would give you the precise measurements that needed support. Yes, agreed, Your Honor. And the jury found that. Now how does this court go against the PTO and the jury? The PTO and the jury plainly did not take into account that this product is designed for multiple currencies. It says it as plain as it can in the specification and in the file wrapper. And there's simply no... there's no reasonable conclusion that the currencies are the same size  Thank you, Your Honor.